Argued and submitted September 30, 2015; in A155542, conviction for reckless endangerment reversed, otherwise affirmed; in A155541, remanded for resentencing June 14, 2017

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JUSTIN LEE COOK,
*Defendant-Appellant.*

Marion County Circuit Court
13C44836, 13C43278;
A155542 (Control), A155541

399 P3d 1026

Kali Montague, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Michael S. Shin, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Hadlock, Chief Judge, and Egan, Judge.

## HADLOCK, C. J.

Defendant, who had been ordered not to have contact with his wife or children as a condition of probation following other criminal convictions, nonetheless removed his two-year-old son, C, from another person's home after he learned that C had been injured by a dog at that house. That incident was reported to police officers, who responded to investigate a possible kidnapping. When officers spotted defendant and C, they ordered defendant to stop and to release C to them. Although defendant did not immediately comply, he let the child go after a few minutes. Defendant subsequently was convicted of recklessly endangering another person, ORS 163.195 (reckless endangerment), and the trial court also revoked defendant's probation on the earlier convictions. In this consolidated appeal, defendant seeks reversal of his reckless endangerment conviction (case A155542), remand for resentencing in the case in which his probation was revoked (case A155541), and reversal of the trial court's requirement that he pay attorney fees in both cases. For the reasons set forth below, we reverse the reckless endangerment conviction in case A155542 and remand for resentencing in case A155541.

In reviewing the trial court's denial of defendant's motion for judgment of acquittal, we set forth the facts in the light most favorable to the state. *State v. Bivins*, 191 Or App 460, 462, 83 P3d 379 (2004). In early 2013, defendant was convicted of reckless endangerment and strangulation. As a condition of his probation in that case, defendant was prohibited from having contact with his wife or their three young children, including C. However, one day in August 2013, while defendant's wife and the children were visiting her friends, Hall and Harris, at their residence (the residence), defendant appeared outside the house at about 8:30 or 9:00 in the morning. According to Hall, defendant seemed "a little bit agitated, upset," as well as intoxicated. Defendant primarily interacted with the children and, at one point, asked one of the children whether Hall was their "new daddy." Defendant's wife also thought that defendant was "under the influence" and that caused her concern about his contact with the children because, when he does "any drugs or drinking," it "messes with his thinking" and

"he does things he wouldn't normally do." Defendant's wife told defendant, who "looked stressed, not right," that he had to leave. Defendant left and, shortly thereafter, his wife departed as well, leaving all three children in the care of Hall and Harris.

Sometime after defendant and his wife left, Hall's dog injured C. Defendant returned to the Hall residence, and Harris sent defendant's wife a text message informing her of defendant's return. Meanwhile, defendant, seeing C's injury, became upset and stated that he did not want to leave C with Hall. When defendant's wife arrived back at the residence, she found defendant sitting with C on his lap. At that point, she told defendant that he was not welcome and that he needed to leave, assuring him that she would handle the situation. After defendant left, defendant's wife made an appointment with C's pediatrician to examine the injury and again left the children with Hall and Harris.

Later that day, defendant again approached the residence, although Hall was not immediately aware of defendant's presence. The front door was open, and C ran outside. When Hall went to retrieve C, he found defendant holding C "like father with a son." Defendant asked Hall to get shoes and a bottle for C, which Hall did. While defendant helped C with his shoes, Harris spoke with defendant's wife on the phone, informing her that defendant had once again returned. Hall attempted to stall for time, testifying that he tried to keep things light to avoid an altercation. Hall thought defendant was concerned because Hall's dog had injured C and that was why defendant "was coming to get his kid."

Defendant left the residence with C on foot. Hall followed, telling defendant that he could not let defendant out of his sight. Defendant responded that he just wanted to spend time with his child. Defendant continued to walk away and Hall continued to follow, for two or three blocks.

At some point after defendant left the residence with C, Harris sent a text message to defendant's wife, who became worried that defendant would "take off" with C or would get into a fight with Hall. Defendant's wife returned to the residence, calling the police on her way. Defendant's

wife also called Hall's cell phone and told Hall that the police were on their way. By that time, defendant had taken C into a field with tall grass in it, and Hall could not see them anymore.

Five police officers responded to the report of a possible kidnapping and spoke with Hall, who told them where he had last seen defendant and C. Officer Bricker then observed defendant and C walking slowly down a sidewalk in a nearby apartment complex. Bricker testified that defendant "was on the left holding hands with [C] who was walking next to him on his right. And they were both just slowly walking down the sidewalk area." Another officer, Mintz, called to defendant by name and told him to stop. Defendant did not stop, but continued to walk away, slowly, holding C's hand. As Bricker and Mintz drew closer to defendant, Captain Pillmore and Officer Boatner arrived, "basically surrounding [defendant], containing him into a smaller area." A detective, Aljets, also arrived, and the five officers all moved to within about 15 to 25 feet of defendant, "having surrounded and triangulated more or less."

At that point, defendant picked up C and held him to his chest. Defendant appeared "extremely agitated" and said he that "wasn't going to put his son down." Boatner, who was familiar with defendant, described defendant as holding C "all different ways" for the next two to three minutes:

> "First holding him standing and then putting him down, and then still holding onto him and crouching behind him, and pretty much holding tight to his child, trying to look around for what appeared to be an escape route."

Pillmore tried to persuade defendant to put C down. As he did so, Pillmore maintained "a real quiet sort of subdued tone of voice." Boatner heard defendant say to Pillmore, "This is my kid. I want my kid." Pillmore responded by telling defendant that he should give C "a hug and kiss, put him down." At one point, it appeared to Boatner that defendant could be using C as a shield, as defendant had kneeled down with C in front of him. However, Boatner also acknowledged that, when defendant had the child in front of him, it was during the time that Pillmore was instructing defendant to hug and kiss C, and then let him go.

Meanwhile, Mintz and Bricker had their tasers in a "low ready position", "out by their leg just in case that something happened." Bricker stated that he had his taser "partially concealed behind [his] right leg" because he "didn't want to agitate anybody. It was already a pretty tense situation." In addition, he did not want to use the taser because, with defendant holding C, Bricker thought "there was a good probability" that defendant would have either dropped C or fallen on top of him. There was also a risk that the taser would miss and hit C instead of defendant. No firearms or additional weapons were drawn and at no time did officers point the tasers at C.

Defendant put C down after two to four minutes, and Boatner picked C up and handed the child to Aljets. However, the situation did not relax immediately. Bricker stated that defendant "was extremely agitated" and "did not like to watch his kid going away." Defendant was physically shaking and talking nonsensically. Defendant noticed Bricker's taser and asked if Bricker was going to tase or shoot him. Defendant, who was not yet handcuffed, at one point, "squared off to [Bricker] specifically because [Bricker] had the taser in [his] hand." Defendant was clenching his fist and gritting his teeth. The officers then put defendant in handcuffs and formally arrested him.

The state charged defendant with three crimes, including reckless endangerment. The parties tried the case to the court, and, at the close of evidence, defendant moved for a judgment of acquittal on the reckless endangerment charge. Defendant's arguments included a contention that his conduct did not constitute reckless endangerment because there was no evidence that he was consciously aware of, and disregarded, a substantial risk of serious physical injury to C. The court denied that motion and found defendant guilty of reckless endangerment. The court's explanation of its verdict focused on its determination that the situation posed a substantial risk of serious injury to C:

> "The defendant threw the child into a situation where the police were in a standoff, and even where a circumstance that's obviously fraught with serious risk of physical injury to anyone at the center of a *** police perimeter a mere 50 feet—50 feet in diameter, 25 to each side. Anyone in the

center of that kind of perimeter, weapons drawn, is in serious risk of physical injury.

"The recklessness placed the child in a situation where there was a substantial risk of serious physical injury. The defendant placed the child in that circumstance. And the defendant declined numerous offers to let the child out of that circumstance. I have no difficulty whatsoever concluding beyond a reasonable doubt that defendant recklessly engaged in conduct that created a substantial risk of serious physical injury to [C]. And so I will find the defendant guilty on that charge."

The trial court sentenced defendant to jail for 365 days and ordered defendant to pay $980 in attorney fees.[1] The court also revoked defendant's probation on his previous convictions and imposed a sentence of incarceration; in addition, it ordered defendant to pay $200 in attorney fees.[2] Finally, the court ordered the sentences in the two cases to run consecutively. This consolidated appeal followed.

On appeal, defendant renews his argument that the evidence does not support a finding, beyond a reasonable doubt, "that defendant's conduct created a substantial risk of serious physical injury to another and that the defendant was aware of and consciously disregarded that risk." In response, the state contends that "the circumstances—including defendant's extreme agitation and outright refusals to return the child—were such that a factfinder could reasonably infer that defendant had created a substantial risk of serious injury" to the child and that defendant was aware of, and consciously disregarded, that risk.

In resolving the parties' dispute, we must determine whether "the evidence, including circumstantial evidence, and all reasonable inferences flowing therefrom, would enable a rational finder of fact to find the essential elements of the offense beyond a reasonable doubt." *State v. Nelson*, 224 Or App 398, 402, 198 P3d 439 (2008). Our analysis begins

---

[1] The court dismissed a count of burglary (Count 1) on the state's motion and acquitted defendant on a charge of assault (Count 2), in case A155542, and we affirm the disposition of those counts.

[2] Defendant's appeal from the probation-revocation judgment is the subject of case A155541.

with a review of the pertinent statutes. ORS 163.195(1) provides that a person commits the crime of reckless endangerment "if the person recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." The term "recklessly" is, itself, defined as follows:

> "'Recklessly,' when used with respect to a result or a circumstance described by a statute defining an offense, means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085(9).

Considering those statutes together, we have explained that, to obtain a conviction for reckless endangerment,

> "the state generally has to prove, *first*, that the defendant performed an act, or omitted to perform an act as required by law ***; *second*, that the act or omission created a substantial risk of serious physical injury to another person; *third*, that the act or omission presented such a substantial and unjustifiable risk of serious physical injury that only a person demonstrating a gross deviation from a reasonable standard of care would so act or omit to act; *fourth*, that the defendant was aware of the risk; and *fifth*, that the defendant consciously chose to disregard the risk."

*Nelson*, 224 Or App at 402-03 (emphases added).

In this case, we need not decide whether the record includes evidence supporting a finding that defendant's acts or omissions created a substantial risk of serious physical injury to his child—the element on which the trial court focused in announcing its decision—because we conclude that, even if such a risk existed, the record does not include evidence supporting a finding that defendant was aware of that risk to C and consciously disregarded it.

The state presented the following evidence in support of its argument that defendant was aware of, and consciously disregarded, a substantial risk of serious physical injury to C: defendant, while in an "elevated emotional state" and apparently intoxicated, violated a no-contact order when

he took C from Hall's residence; defendant initially refused to stop walking or to put C down when directed by officers during the two-to-four minute standoff; defendant was surrounded by five officers, who stood 15 to 25 feet away from him; Boatner testified that defendant appeared to be "trying to look around for what appeared to be an escape route" and that defendant may have been "using [C] as a shield"; and "Officer Mintz and Officer Bricker [had] their tasers out by their leg just in case that something happened."

That evidence does not support a reasonable inference that defendant was aware of a substantial risk of serious physical injury to C during his two-to-four-minute encounter with the responding police officers. Nothing in the record suggests that defendant took any actions of a sort that he would have recognized created a substantial risk of prompting a significant physical—and injurious—response by the officers. To the contrary, the evidence shows only that defendant walked "slowly" with the child, that he stopped and did not attempt to escape once he was surrounded, and that he kneeled down at one point with C in front of him, as he was being instructed to hug the child and let him go. Although one officer testified that he thought defendant might have been using C as a shield at that point, nothing in the record suggests that defendant thought there was anything he needed to shield himself from, as no evidence indicates that he became aware that any officers had drawn their tasers until after he had let C go and the child was safely in an officer's care.

Moreover, no evidence suggests that the officers did anything that defendant would have recognized as escalating the riskiness of the situation. Rather, the evidence establishes that Pillmore spoke in a "soothing" tone of voice during the entire encounter and that the two officers who drew their tasers held those weapons beside their legs to prevent agitating defendant. In addition, each of the officers stopped 15 to 25 feet away from defendant and nothing in the record suggests that defendant had reason to believe that any of the officers might tackle him or take other direct physical action. Under those circumstances, only impermissible speculation or guesswork could lead a factfinder to determine that defendant was aware that his actions were

creating a substantial risk of serious physical injury to his child, and that defendant consciously disregarded that risk. *See Bivins*, 191 Or App at 467 ("Reasonable inferences are permissible; speculation and guesswork are not.").

Accordingly, the trial court erred when it denied defendant's motion for judgment of acquittal on the reckless endangerment charge, and we reverse defendant's conviction in case A155542. Because the sentence in case A155541 was predicated, in part, on the conviction in case A155542, we also remand the judgment in case number A155541 for resentencing. That disposition obviates any need for us to consider defendant's argument that the trial court erred by requiring him to pay attorney fees in both cases.

In A155542, conviction for reckless endangerment reversed; otherwise affirmed. In A155541, remanded for resentencing.